The next case this morning is 522-0302 Campbell et al versus White County Coal, LLC, etc. Arguing for the appellant Campbell et al is Jeffrey Barron. Arguing for the appellee White County Coal, LLC is John Rhine. Each side will have 15 minutes for their argument. The appellant will also have five minutes for rebuttal. Please note only the clerk is permitted to record these The trial court erred in finding that White County Coal is not in breach of its underground storage lease with my clients the Campbells, given that the lease provides that White County Coal must pay rent whenever it injects, stores, or disposes of slurry in any of the voids within the Petiki One mine works. And given that White County Coal continues to inject fluid into the voids to this day. And I'd like to state there's two reasons why its current injections still, sorry I have an automatic light, why the current injections still trigger rental payments. First, under the plain language of the lease, White County Coal must pay rent if it injects slurry into the voids. And that is exactly what it continues to do to this day. Now this lease counsel, was that the result of a dispute that was settled and they drafted this Yes, your honor. And who drafted that lease? It was a, it was the White County Coal's lease I believe, but it was through a joint negotiation. But who actually prepared it? I believe the White County Coal drafted it and then they exchanged drafts back and forth. Okay, thank you. And so, can that be found, where can that be found in the record, what you just told me? I don't know if the emails exchange is going back. I would have to go look in the record to see. I know that in discovery, Mr. Ryan produced some emails showing drafts going back and forth, but I don't know if those are in the record. Okay, Mr. Ryan will have an opportunity to address that during this portion of the argument. And so, with these injections, White County Coal has to register its injection wells with the Illinois Environmental Protection Act. And on its registration form for its current injections, it describes the well as a slurry injection well. And it describes the fluid that it's injecting into the voids as a slurry made up of water, rock, clay, and coal. But originally that did include slurry and now they're arguing that it's just water. And that is what they're arguing, but they never amended their form. And I don't mean to stop you, but Mr. Ryan, could you put your computer on mute, please? That's fine, thank you. They never amended the form, and also that's the same language they used for all of their slurry injection wells. Why would that make a difference? Because they're describing it as slurry on their penalties of perjury on the registration forms, that's how they're describing it. But in fact, they terminated paying because it was no longer slurry, didn't they? That is what they're arguing, is that whenever they stopped processing coal at the prep plant, that they no longer had to pay any rental payments. But the issue is that their NPDES permit requires them to use their underground slurry disposal system. It's one system that they have to use to inject any waters that are in contact with coal and the two locations that are identified in their permit are the RDA sump, which is where they're currently injecting, and then the second location was their prep plant. Now, as I understand it, this injection well is quite a distance from your client's property border, is that true? That is correct. I'm not exactly sure, but it's probably close to a mile. But that, though, doesn't matter because under the lease, it provides that if they inject into any voids within the Patiki One mine, that triggers rental payments. It's not just the voids underlying my client's property. The reason being is that all the voids are interconnected. What would happen to those voids naturally if they were not injecting water? Naturally, they would just be voids unless there would be some type of, I guess, leakage. Don't they fill up with water anyway? Some voids can, some voids don't. It all depends on the geology. And so under the lease, if they inject into any of the voids, they have to pay rent. And also, I think that they argue, well, it's a separate system that they're using at the sump, at the RDA, and at the prep plant. But if you look at their permit, it's only one system. It's the underground slurry disposal system, and that's it. And all the wells that they're using are registered as slurry injection wells. And they've all been registered that way, whether they're injecting from the RDA or if they're injecting from the prep plant. And their mine engineer, who claimed in his affidavit that, well, these are separate systems, when I asked him, though, at his deposition, he admitted, though, that there's only one system that they've used, and that they've been using that for 20 years to inject both from the RDA and at the prep plant. And his deposition testimony can be found at the portion of the record E1-986 through 988. But not only is it set out in their permit documents that they're injecting slurry, but I asked their expert, John Weiss, who's a mine engineer, and he works for John T. Boyd company, and I asked him, well, this registration form that describes the fluids that they're injecting, is that accurate, that it's a slurry made up of rock, water, clay, and coal? And this exchange, he stated, I stated, but on this form, they have a description of the fluid. Can you read that? His response, under point nine, injection fluid information? Question, yes. His answer, description of fluid, a slurry made up of water, rock, clay, and coal. The question then, and would you disagree with that description? And his answer is no. Likewise, I asked him at his deposition about the similarities between the injections at the prep plant and at the RDA, and I asked, would you expect to find the same types of chemicals in both the waters at the retention pond and at the prep plant? And he responded, yes, the water is water, and slurry being fine coal waste with water includes water and fine coal particles. The content of what is in the course material is, includes some of those things. It will include clays, it will include silts, it includes sand, sandstone rocks, and it will include misplaced coal in larger size consists. So not only do their permit documents describe this as a slurry, their expert agrees that this is, that it's an accurate description to call it a slurry, what they're currently injecting under, into the voids, and since they're injecting it into the voids under the plain reading of the lease, they have to pay rent. I'll move on to the second point unless anyone has further questions on that issue. Under the second reason why they have to pay rent is because of the definition of slurry in the lease. The lease defines slurry as water and coal slurry. The only reasonable interpretation of that term is that if water and coal slurry are deemed as a collective, that it either or both are, will qualify as slurry. Now the trial court when you have slurry, the only reason that you have water with coal residue to make slurry is because the only way you can make it pump is to add water. Yes. Whereas whenever you have a well that's just injecting water, isn't that a totally different situation? Well it depends on the well. Here, coal slurry, everybody agrees, is water and coal refuse. It's the combination of the two. The lease though doesn't have any type of quality or quantity or ratio requirements set out as to when water is water, when it's coal slurry, or when it's water plus coal slurry. Now White County Coal, they argued in their briefing that generally it's anywhere from 10 percent solids to 40 percent solids with the remainder being water. But whenever I deposed Mr. Weiss, I asked him at his deposition if that was actually an industry definition and he said no, that's just more a rule of thumb for the efficient pumpage of coal slurry. And then I asked him, well what happens if you have 99 parts water and only one percent coal refuse, would you still deem that coal slurry? And he said yes. So here you have coal slurry which could be up to 99 percent parts water and then you have another, they're adding water to that and the definition, it doesn't make sense. It's superfluous. If they wanted to pump just coal slurry at the prep plant, they could have included in the lease that we, anytime we pump coal slurry at the prep plant, we have to pay rental payments. But the lease does not state that. They don't identify a source from the prep plant. They just say anytime you pump water and coal slurry. Council, would you not say then, say there's farming in the area and it rains and all the water that runs off, there's probably some coal dust in that. And to say some rock dust, so you would call any runoff no matter what in that area slurry by definition that you're using. You're saying percentages, so it may be a half a percent of coal dust, some clay because it's not that great a farm. And so that makes it from the RDA, which is contaminated with coal refuse, or if they're pumping it from the prep plant, which is contaminated with coal refuse, that is water and coal slurry. And so if it was on a farm and there's no requirements that they pump it underground, then that's not slurry by your definition. I think it is. Because you say no percentages of coal and no percentages of rock can fill any percent because you're going to have a little bit of each. You're calling that slurry. Is that correct by your definition? I wouldn't say that if there's any at all. Both elements, you've got both elements in there. But it requires that both elements. And then there is both elements no matter where it is. Is that what you're saying? So actually the runoff from the farm is probably slurry. If it would be deemed that by, I guess, the state. By your definition, that's what I'm trying to get at. By your definition, it's slurry. So any runoff is slurry. If it's water mixed with coal refuse, yes. Which it probably would get from the dust in the area. Yeah, that's slurry. That would be water and or coal slurry under the lease. Yes. And the reason being is because otherwise, why would they not just say coal slurry pump from the prep plant? Because otherwise they have a rent-free option. They can claim, look, we're only just pumping coal slurry. That's it. We don't owe rent because we're not pumping water into the voids. We're not pumping coal slurry. It's just water because it's such a miniscule amount of coal refuse. So they didn't add the water at all because it came from rain. Is that correct? At the RDA, it is the rain that comes down and leaches through the refuse pile. Yes. That's where that source is. And also, if you look at the context of the lease, the parties had a dispute. That's how they all got started in this. And my client sent them a letter saying that under their former coal mining lease, they had no right to put water or any coal waste into the voids without a lease. And that's exactly what White County was doing. Since 2002, they've been pumping from both locations down into the voids in accordance with their permits. And so based on that context, it makes sense that they would capture both ahead and finish your thought council. Okay. Yeah, I was just saying that it makes no sense that they would agree that, okay, well, you can pump in this one location into the voids and fill it. But if you want to, you can pump all you want and the other location and not pay rent whenever you're filling the voids either way. Well, thank you, council. Obviously, you'll have your opportunity for rebuttal. But before we get to Mr. Ryan, Justice Welch or Justice Moore, do you have any questions at this time? No. All right. Thank you. Mr. Ryan, go right ahead. Thank you, Your Honor. May it please the court, Mr. Barron. Let me first try to answer the question concerning where in the record. Unfortunately, I was unable to I think it may have even been in the initial pleadings because it was pled that these three agreements were signed simultaneously after negotiations. And I think each side was represented by counsel. I don't know if that was pled. I know that it was discussed in the trial court and that was part of the trial court's ruling. Would that be reflected in the discovery? I believe so. But I can't cite it right now like Mr. Barron. Let me go ahead and start with your argument. There's a question that I'm that's on my mind that I'd like you to address. Yes. And that is because both storage of slurry and disposal of slurry are allowed under the lease. Why wouldn't it be a question of fact that's not appropriate for summary judgment whether White County Coal was exercising its right to store slurry or was exercising its right to dispose of it? Well, some facts may be decided on summary judgment by supporting affidavits. And White County Coal submitted two affidavits that directly address this question. First, the mine planner has submitted an affidavit. It said, and I'm going to quote, at no time did any mine plan or reclamation plan related to White County Coal LLC include retrieval of the coal slurry or any part of it, end quote. And then White County Coal's expert testified that it was not even possible to retrieve slurry from this underground mine void. So I think the conclusion is it couldn't be retrieved. It could not be stored. It was disposed. That's our position. On the question of whether or not rainwater is, this is really rainwater that goes off the pile, the rock pile. It does not, the record shows that does not have any solids visible to the naked eye. It does, the rock pile contains some bits and pieces of coal, but the microscopic elements do not make up coal slurry, which by definition it was testified to by our expert was 10% to 40% coal fines in general. The Campbell's did not offer any evidence to refute this. Now he's saying, in depositions, 1% would be slurry, but this isn't even that. If there is any coal in the water, it's microscopic. This water, again the record shows, could actually be diverted to streams if it were treated for pH. It's got a low pH factor. It's acidic. And instead of treating it, the environmental regulators allowed them to dispose of it into the mine void, which is probably going to fill up with water anyway, but it's not certain. So all they would have to do is add alkaline to the water and it could be dumped in a stream? Well, I'm not a scientist, but I think that's correct. Yes. But they like to just put it into the mine void. And again, this operation was a separate operation a mile away that was not related to disposal of the coal slurry. And all I can say is, you know, a microscopic element that you can't see does not make rainwater coal slurry. I think some things, I mean, it's a speck of dirt in a bucket of water. It doesn't make it mud. We just think that it's pretty apparent. In terms of the, an argument was made in the appellee's reply brief that basically the appellants, I'm sorry, the appellant's reply brief, that basically the appellants were not sophisticates and therefore they should be able to basically say, we didn't know what coal slurry meant. So we wanted, you know, we'd like to substitute water for it. In my view, this is really a red herring. I mean, there's no question that three documents were signed at the same time, including this one. They were negotiated. The parties are represented by council. If the council did not know what coal slurry was, they knew where to find out. If, just because a non-certificate or a non-sophisticate signs a contract doesn't mean they can replace a word with some other word. If that were the case, untold number of contracts would be unenforceable under their terms. I mean, every oil and gas lease, for example, has technical terms for that industry. And the record does show that John and Jacob Campbell actually contracted with White County Coal before this was signed to remove coal slurry from a, there was a seal that broke in a pipe, an overland pipe, and dumped coal slurry on land. And the Campbells and their oil company contracted with White County Coal and spent three months under supervision of John and Jacob Campbell removing that slurry. So, we don't think they are non-sophisticates. But even so, the rule of construction favoring non-sophisticates only applies when the contract is otherwise ambiguous. Because if it's not ambiguous on its face, then that rule does not apply. And to me, in getting back to a couple other arguments they made that and should be read as or, we don't think that's really, the law does not provide for that. There are a few, and they are called unusual cases by the Illinois Supreme Court, cases that say that in statutory construction, sometimes it's necessary, when you look at the statute as a whole, to substitute the word or for and. But in general, if someone, if a condition in a contract is you must do A and B as a condition, then you must do A and B, not A and, I'm sorry, not A or B. Really, we had a hard time finding any case that applied this rule to contracts. We did find one insurance case. The appellant does cite Chicago Land Clearance Commission v. Jones, which does have dicta that says in a contract, if otherwise evident, then the word and can be replaced by or. But that case didn't do that. It found that, you know, it didn't really hold that. That was dicta. In fact, we cite this case ourselves, and we're glad that Campbell cited it because, and we asked the court to look at it. That's the Chicago Land Clearance Commission, 13 L. Absecond 554, 1957. It's got a great summary of the law on this. It says construing the word and as the word or, and I hate to give long quotes, but I don't think we could write it any better. Quote, is never resorted to except for strong reasons, and the word should never be so construed unless the context favors the substitution, end quote. They also said it's only done if, quote, if and read as and, quote, leads to an absurd result, end quote. And finally, quote, in construing a contract, the primary object is to ascertain the intention of the parties. That intention must be determined from the language of the contract. If the intention may be ascertained from the wording of the contract, rules of construction have no application. No words can be added to or taken from a contract and thereby change the plain meaning of the parties as expressed therein, nor may the courts engage in surmises to what the parties intended, which they failed to express. You know, if the parties had wanted to say coal water or coal slurry, they could have just said that. But it's water and coal slurry, and that makes perfect sense. Coal slurry is too viscous. It's too thick. It won't go through a pipeline. It can't be injected unless you add water to it. If the contract had been drafted to say just coal slurry instead of water and coal slurry, you know, the Campbells probably would have sued White County for adding water to the coal slurry that was injected. So, we don't feel that that's a valid argument. So, all really White County Coal is asking is that the contract between the parties be enforced as written without deletion of key words, without substitution of one word for another, especially one that flips the meaning. Now, you know, the contract, it's not a straightforward buy-sell contract, a super simple one. But in today's commercial world, it's not that complex either. Parties should be able to negotiate agreements concerning mining and industrial activities, write down what they agree upon, and have that agreement be binding. So, I'd like to thank the court for my argument, and I'm available for any questions, of course. Thank you, counsel. Justice Welch or Justice Welch? And so, counsel, is it your position that this can be determined as a matter of law and that there's no question of fact? Yes, Your Honor. Anything else, Justice Moore? No. All right. Well, thank you, counsel. Mr. Barron, go right ahead with your rebuttal. You're on mute. Can everyone hear? Yes. Great. Justice Moore, you asked about slurry disposal versus slurry storage. And we do point out in our brief, and we cite to the record, where White County Coal's own documents, they set out in over 70 entries where they're tendering payment over the course of the lease that it was for storage fees. And also, the lease itself, it's an underground storage lease. And if you look just to the context of how they, when they negotiated this, prior to the White County Coal injecting slurry underground and water underground, they stored all of their refuse offsite in a farmer's field. But in 2002, when they were winding down the Petit Key One mine, they decided to move all of their refuse onsite. And so they constructed the RDA, and they also then got permission with the Illinois Environmental Protection Agency to operate their underground slurry disposal system to start disposing water contaminated refuse into the voids. And so prior to this, they were paying for storage. This is what they also are doing under this lease, is they need a place to put their refuse. This is the most economical way for them to dispose of it, and that's what they're doing. And also, as to Mr. Ryan's point that this is just rainwater that they're injecting underground, then why are they required, though, to inject it underground with their underground slurry disposal system? It's not just rainwater. Under their permit, they have three outfalls that they can discharge into the Wabash River, and their permits allow them to discharge rainwater through these outfalls. There's no requirement that they use the underground slurry disposal system. The only time they have to use, they're required by law to use the underground slurry disposal system is if they have water that's been contaminated with refuse. And the only two locations are the prep plant and the RDA sump. And also, Mr. Ryan mentioned that my clients helped remove slurry spill prior to the parties entering into the lease, and that date is incorrect. The lease was executed in 2008, and then in 2014 is when the parties contracted for the slurry removal. And that can be found in actually Chris Russell, White County Coals affidavit on that point. And the last point I'd like to make is adding water, talking about adding push water to make the slurry flow better, but that's all still just adding water to coal refuse. You're just adding more water, and so the ratio is more water, and the ratio of the coal refuse is less. It doesn't change the substance, though. That's still coal slurry. It doesn't make sense to add water on top of that. Again, they should have just said coal slurry, and they should have identified the prep plant if that's what they meant, but they didn't. They didn't identify the prep plant as the source, and they identified both water and those were the things they had to inject pursuant to their permits, and that's the only reason why they entered into the lease to begin with, is because they needed the rights to put this water and coal refuse underground. I have no further questions, or unless anybody has questions, I'm done. Sorry. Well, thank you, Council. Before we let Council go for the day, Justice Moore or Justice Welch, do you have any last questions? No other questions. All right. Well, again, thank you, Council. Obviously, we'll take the matter under advisement and issue an order in due course.